## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| PETERS TOWNSHIP SCHOOL DISTRICT | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | | |
| v. | : | Civil Action No. | 2:23-cv-228 |
| | : | | |
| C.B., a minor, and his parents, J.B. and A.B., | : | | |
| | : | | |
| Defendants. | : | | |

### COMPLAINT

AND NOW, comes the Plaintiff, Peters Township School District, by and through its undersigned counsel, Rebecca Heaton Hall, Esquire and the law firm of Weiss Burkardt Kramer LLC, and hereby files the following Complaint, and avers as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under the Individuals with Disabilities Education Improvement Act (hereinafter "IDEA"). 20 U.S.C. §1400.

2. Plaintiff, Peters Township School District (hereinafter "District" or "School District"), has exhausted its administrative remedies under the provisions of the IDEA by participating in an impartial due process hearing as required by 20 U.S.C. §1415(f). A true and correct copy of the November 15, 2022, Decision is attached and marked "Exhibit A" (redacted to preserve the privacy of C.B. and his family).

3. Venue lies within this judicial district as each of the actions complained of occurred within the Western District of Pennsylvania.

## PARTIES

4. Plaintiff School District is a municipal corporation within the Commonwealth of Pennsylvania with a principal place of business at 631 East McMurray Road, McMurray, Pennsylvania 15317.

5. Defendant C.B. is a student in the School District and is protected by the IDEA as a student with a disability.

6. Defendants, father J.B. and mother A.B., are the parents and natural guardians of C.B. who reside within the Plaintiff School District's geographical boundaries. C.B., father J.B., and mother A.B. are hereinafter collectively referred to as "Defendants."

## FACTUAL BACKGROUND

7. C.B. entered the District at the start of his fourth-grade year (2017-2018).

8. At the time of his fourth-grade enrollment, he qualified for an Individualized Education Program (hereinafter "IEP) with a primary disability of Autism and a secondary disability of Speech or Language Impairment.

**2019-2020 School Year – Sixth Grade**

9. For the 2019-2020 school year, C.B. was a sixth-grade student at McMurray Elementary.

10. His October 2018 annual IEP carried over to sixth grade and contained a Positive Behavioral Support Plan (hereinafter "PBSP).

11. The PBSP addressed physical aggression with adults or peers by hitting, pinching, scratching, grabbing, pulling hair, head butting, and throwing items.

12. In September 2019, C.B. engaged in three (3) instances of physical aggression with adults, zero (0) instances of physical aggression with peers, and three (3) instances of throwing objects.

13. The District previously requested permission to conduct a Functional Behavioral Assessment (hereinafter "FBA") and the parent consented.

14. On September 27, 2019, the FBA was issued along with a Reevaluation Report (hereinafter "RR").

15. The September 2019 RR contained a summary of previous assessments, input from private evaluators, local and state assessment information, teacher and related service provider input, data from previous IEP goals, and assessments from the school psychologist measuring cognitive, achievement, adaptive behavior, social and emotional learning, speech and language assessments, and the data collected from the FBA.

16. C.B.'s IEP and PBSP were updated to reflect the needs identified in the RR and FBA.

17. The October 23, 2019, IEP recommended a placement of thirty-eight (38) percent of C.B.'s school day in the regular education setting. He attended Specials (art, gym, etc.) and Science and Social Studies with typically developing peers.

18. C.B.'s parents brought an individual who indicated they were an expert in Autism to the October 2019 IEP team meeting to assist in developing the IEP and PBSP. A one hundred and eleven (111) page IEP was developed.

19. In November 2019, Parents requested an Assistive Technology evaluation to explore the ways that technology could assist C.B. in the classroom. On December 2, 2019, Parents signed permission to proceed with the Assistive Technology evaluation.

20. The Assistive Technology evaluation was contained within a February 6, 2020, RR and consisted of various observations, teacher input, and Assistive Technology trials. The overall result of the evaluation was for C.B. to continue with verbal communication and no significant Assistive Technology recommendations were made. The use of technology for C.B. at school can be distracting.

21. Following an increase in acting-out behaviors in December 2019 and January 2020, and an emerging behavior where the student would inappropriately place his hands inside his pants, the District requested permission to perform an FBA. Parents did not grant permission for the FBA, and the District could not proceed with the evaluation.

22. The February 2020 IEP was issued to include information from the January 2020 RR. The February 2020 IEP was revised on June 2, 2020 and September 30, 2020. The PBSP was also revised based on the prior September 2019 FBA since Parents did not grant permission in December 2019, to conduct an FBA.

23. The February 2020 IEP recommended that C.B. receive his education in a general education classroom for thirty-eight (38) percent of his school day.

24. The February 2020 IEP recommended Extended School Year (hereinafter "ESY") programming for C.B. at the District for the summer of 2020.

25. At the end of the day on March 13, 2020, the Governor closed schools in the Commonwealth for in-person learning.

26. Initially, the District circulated school work for students on paper.

27. On April 21, 2020, C.B.'s IEP team met to designate goals and instruction that would be delivered to C.B. utilizing virtual learning platforms. C.B. participated in virtual learning for the remainder of the 2019-2020 school year.

28. During virtual instruction, C.B. continued to receive his related services and was provided with synchronous instruction and individual check-ins with his teachers.

29. On May 14, 2020, the District issued a Prior Written Notice/Notice of Recommended Educational Placement (hereinafter "PWN/NOREP"), revising its ESY offering to provide virtual ESY summer programming for 2020.

30. C.B. participated in the summer 2020 ESY virtual programming which provided synchronous instruction.

31. Parents' Due Process Complaint contains no allegations against the District from February 2020 to January 2021. Although the District preserved objections regarding any evidence presented between February 2020 and January 2021, the Hearing Officer deferred his ruling but then did not address the objection in the Decision.

32. C.B.'s Parents continually criticized the District's efforts to program for C.B. which caused stress on District staff.

33. Numerous IEP team meetings and informal meetings were held throughout the 2019-2020 school year. Although C.B.'s disability is profound, the District believed he made progress in light of his circumstances. The District provided a myriad of supports and instruction that C.B. required for the provision of FAPE.

**2020-2021 School Year – Seventh Grade**

34. As the result of normal grade-promotion, C.B. began to attend a different school building at the Peters Township Middle School (hereinafter "PTMS") for seventh-grade.

35. At the start of the 2020-2021 school year, the District returned all students to five (5) day a week in-person learning, but per state and CDC guidelines, students were

required to wear a facial covering and remain socially distant (six (6) feet apart and the hallways were one-way). Numerous COVID-19 precautions were in place at the District so that students could return to full-time in-person learning. Indeed, the learning environment was significantly changed to meet state and federal guidelines with less opportunities for social interactions for all District students.

36.     The District was subject to in-person closure requirements from the Commonwealth. If a certain number of COVID-19 cases were reported within a school building, the building was forced to close for in-person learning. Although the District was forced to close for in-person learning in December 2020, C.B. and his peers in his special education classroom, continued to be brought in the building for in-person learning.

37.     Following a series of acting out behaviors including throwing an object and hitting his teacher in the head, on October 28, 2020, the District issued a Permission to Reevaluate form requesting permission from Parents to conduct an FBA. Parents would not provide consent to conduct an FBA.

38.     On February 10, 2021, the IEP team developed a new annual IEP for C.B.

39.     It was noted in the February 2021, IEP that during December 2020, when the majority of students were forced to attend school remote but C.B. and a small group of peers were permitted to attend in-person, he seemed at ease.

40.     The Math Application goal was revised in the February 2021 IEP to include two-step addition and subtraction word problems. His previous goal targeted single step addition and subtraction word problems. The goal included short-term goals to build C.B. into full performance of the goal. For example, the first short-term goal addressed one step addition and subtraction for two (2) digit numbers, the second short-term goal was for two-

6

step single digit addition and subtraction for single digit numbers, and the third short-term goal was for two-step double digit addition and subtraction word problems. The short-term goals together addressed the goal as a whole and developed a plan as to how C.B. could master the goal. Data was tracked on this goal in a sequential manner working through each short-term goal. By the end of the annual IEP, C.B. had mastered the goal by achieving all short-term objectives.

41. Parents did not complain or express any concerns with the format of the Math Computation goal. Their Due Process Complaint further did not mention concerns with the format of the Math Computation goal.

42. C.B.'s parents requested an independent FBA to be performed at the District's expense. After much discussion, the District and Parents agreed to have Eric Bieniek, a doctoral level Board Certified Behavior Analysis (hereinafter "BCBA-D") perform the FBA. The BCBA-D served as an independent contractor for the District providing consultation and conducting FBAs.

43. In May 2021, a timely FBA was issued by the BCBA-D.

44. Parents also requested to have an independent evaluation at public expense performed by a school psychologist. In May 2021, the District granted Parents request.

45. After the FBA was performed by the BCBA-D, in June 2021, the IEP team reconvened and developed a new IEP and PBSP that incorporated the results of the FBA. The BCBA-D participated in the development of the IEP and PBSP and believed that the programs offered were appropriate for C.B.

46. Although the IEP team addressed the need for ESY at each meeting, in March 2021, the District issued a PWN/NOREP offering its in-person ESY program for

the summer of 2021 to target the goals identified by the IEP team. Parents requested a private ESY program at Camp SPEAK, but the District declined to support or provide payment for the Camp SPEAK program. Parents placed C.B. at Camp SPEAK for the summer of 2021.

47. Leading up to the 2020-2021 school year, the Pennsylvania Department of Education recommended that all public schools should assess special education students to determine if they had regressed during the COVID-19 school closure and were unable to recoup their skills when schools reopened for the 2020-2021 school year. The District collected data on C.B.'s IEP goals and found that C.B. was able to maintain or recoup skills and continued to make educational progress at the District when it returned to five (5) day a week in-person learning for the start of the 2020-2021 school year. On March 24, 2021, the District issued a PWN/NOREP indicating its reasons and that C.B. did not qualify for COVID Compensatory Services (hereinafter "CCS") because there was no regression without recoupment of skills.

48. Parents adamantly disagreed with the denial of CCS. The District continued to work with Parents and in April 2021 ultimately offered CCS services for tutoring after school for two (2) days a week until the end of the school year (the offer was memorialized into writing in May 2021). Parents did not respond to the offer of tutoring, and in a June 2021 PWN/NOREP, the District offered CCS in the form of tutoring in September 2021. Parents did not respond to the second offer of CCS.

49. C.B.'s Parents continually criticized the District's efforts to program for C.B. which caused stress on District staff.

50.     Numerous IEP team meetings and informal meetings were held throughout the 2020-2021 school year.  Although C.B.'s disability is profound, the District believed he made progress in light of his circumstances.  The District provided a myriad of supports and instruction that C.B. required for the provision of FAPE.

**2021-2022 School Year – Eighth Grade**

51.     C.B. attended the eighth grade for the 2021-2022 school year.  He continued to have the same special education teacher; however, because of the construction of a new High School, students at PTMS were moved to the old High School building.  C.B. appeared to accept the transition of a new building well.

52.     For at least the first half of the school year, the District was still subject to COVID-19 protocols which incorporated facial coverings and social distancing.

53.     The June 2021 IEP and PBSP were in place for the start of the 2021-2022 school year.

54.     A Task Accuracy goal was added to C.B.'s June 2021 IEP.  The goal measured C.B.'s completion of independent assignments and work tasks over a nine-week period.  The goal was set for seventy (70) percent accuracy in completing four (4) out of five (5) assignments or tasks for nine (9) weeks.  Progress monitoring data taken quarterly revealed that C.B. did not immediately master the goal since he was only achieving at the seventy (70) percent level of accuracy for four (4) weeks.  By the third quarter of the 2021-2022 school year, C.B. achieved seventy (70) accuracy for five (5) weeks.  By the fourth quarter of the 2021-2022 school year, C.B. mastered his Task Accuracy goal.

55.     In September 2021, Parents requested to perform observations of C.B. in various classes over the course of two (2) to three (3) days.  To minimize classroom

disruption, the District has a Policy in place to permit parents a maximum of one (1) observation per month. A September 28, 2021, PWN/NOREP was issued denying the Parents request and indicating that the District would permit observations in accordance with its Policies.

56. Also in the fall of 2021, C.B. became the team manager for the PTMS football team. The District provided him with one-on-one support during practices and games. Because the Director of Special Education could not find any teachers or paraprofessionals willing to provide one-on-one support to C.B. at football, she personally served as his support person. Initially, C.B. came to practices a couple times per week, but the Parent decided that he should go to every practice and every game, to which the District complied. Practices were held each day after school; therefore, C.B. did not take the bus home much of football season. C.B.'s experience as the football manager was successful.

57. After football season concluded, C.B. became the manager for the PTMS basketball team. He was again provided one-on-one support at basketball practices and games. Basketball practices were held after school; therefore, C.B. did not take the bus home much of basketball season.

58. Following a behavioral incident, on December 14, 2021, the District issued a Permission to Reevaluate requesting to conduct an FBA. Parents did not provide permission.

59. Behavioral incidents continued to occur and the District issued a Permission to Reevaluate to conduct an FBA again on March 25, 2022, and April 27, 2022. Parents continued to deny permission to conduct an FBA.

60. Some of the progress reporting data on C.B.'s behavior goals had small declines in progress; however, Parents continually prevented the District from conducting FBAs that would have provided insight as to C.B.'s behavioral needs.

61. Although the IEP team addressed the need for ESY at each meeting, in March 2022, the District issued a PWN/NOREP offering its in-person ESY program for the summer of 2022 to address the goals identified by the IEP team. Parents requested a private ESY program at Camp SPEAK, but the District declined to support or provide payment for the Camp SPEAK program. Parents placed C.B. at Camp SPEAK for the summer of 2022.

62. In May 2022, the Parents brought to the attention of the District an issue where C.B. was being dismissed to the van ten (10) to (15) minutes earlier than the other students at the PTMS. The District investigated the bus issue and offered thirty (30) hours of compensatory education to make up for any time lost. The thirty (30) hours was more than C.B. actually missed of school because there were numerous days he did not ride the bus home because of football and basketball practices. Parents did not accept the offer of compensatory education.

63. The independent evaluator issued a report in May 2022, which was one (1) year after the District granted permission for the independent evaluation. There was no indication as to why the independent evaluation took a year to complete.

64. In June 2022, a new IEP and PBSP were developed.

65. C.B.'s Parents continually criticized the District's efforts to program for C.B. which caused stress on District staff.

66. Numerous IEP team meetings and informal meetings were held throughout the 2021-2022 school year. Although C.B.'s disability is profound, the District believed he made progress in light of his circumstances. The District provided a myriad of supports and instruction that C.B. required for the provision of FAPE.

**Parents' Due Process Complaint**

67. The parties preserved a statute of limitations date of September 27, 2021, to which the Hearing Officer upheld. Claims presented from September 27, 2019, to the end of the 2021-2022 school year were permitted.

68. The allegations in Parents Due Process Complaint for C.B.'s sixth-grade year (2019-2020) all centered around the behavior supports provided, the Assistive Technology evaluation, a Reevaluation Report issued, and the refusal by the District to implement the Touch Math curriculum. Parents did not dispute any of the Related Services such as Speech and Language or Occupational Therapy. Parents also did not dispute in their Due Process Complaint the services provided during the COVID-19 school closure for the spring 2020.

69. Parents' Due Process Complaint contained no allegations during the time period of February 2020 to January 2021. Although the District preserved objections regarding any evidence presented between February 2020 and January 2021, the Hearing Officer deferred his ruling, but then did not address the objection in the Decision.

70. Parents Due Process Complaint did not address any concerns with the format of the February 2021 IEP's Math Computation goal or report of progress monitoring.

71. Parents Due Process Complaint did not address any concerns with the format of the June 2021 Task Accuracy goal or report of progress monitoring

72. Parents Due Process Complaint did not allege any deficiencies with the speech and language supports and services provided to C.B. Given this fact, neither Parents nor the District called C.B.'s speech and language therapists to testify in the due process hearing sessions.

73. Parents' Due Process Complaint centered on claims of alleged improper behavioral supports, least restrictive environment, reimbursement for private summer programming, and lack of COVID compensatory services.

**District's Due Process Complaint**

74. The District filed its own Due Process Complaint to address C.B.'s eighth grade year. Parents continued to complain of deficiencies in various portions of the District's eighth grade program including curriculum, least restrictive environment, and ESY services. In order to avoid the Parents filing a future Due Process Complaint alleging inadequacies in eighth grade where the same witnesses would again be called to testify, the District placed eighth grade into issue.

75. The District proactively admitted that at times C.B. was take home ten (10) to fifteen (15) minutes early during eighth grade when he would ride the bus. The District issued a PWN/NOREP indicating the same and offering more hours of compensatory education than was even missed to remedy the situation.

## Count I

**The Hearing Officer erred when he Ordered twenty-five (25) hours of compensatory education to address social skills for the period of February 2020 to February 2021 because Parents did not raise this concern in their Complaint, COVID-19 protocols were mandated, and C.B. made progress on his Social Opportunities goal.**

76. The February 2020 IEP contained a goal targeting pragmatic language skills by using greetings, joining a group, and asking/answering questions for two (2) to three (3) exchanges in eighty (80) percent of opportunities over three (3) consecutive quarters.

77. The Hearing Officer ordered the District to issue twenty-five (25) hours of compensatory education for the Social Opportunities goal.

78. In ordering the compensatory education, the Hearing Officer found that there was not "an overarching flaw in the goal's design" and not a lack of progress. He indicated that the award was "rooted in a lack of precise service" but does not explain what is meant by this statement.

79. C.B. received his "precise service" of speech and language therapy thirty (30) minutes per week. Speech and language therapy even occurred virtually during the mandated COVID-19 closures during the spring of 2020. Speech and language therapy also continued to occur during the December 2020 building closure to which the District brought C.B. and some of his special education peers in for in-person learning.

80. The Hearing Officer found that the Social Opportunity goal was "written so that the student can deepen [peer] interactions in a more meaningful way" and goes on to criticize that the progress monitoring reports on structured peer interactions.

81. The goal itself is written to track data in structured social opportunities. Despite this, the goal tracks data on both structured and unstructured social interactions.

82. While the Social Opportunity goal is appropriate and data is responsive, the COVID-19 pandemic and social distancing mandates certainly complicate the execution of not only C.B.'s social interactions but of the social interactions of all students at the District.

83. Parents further did not make any allegations against the District in their Due Process Complaint from February 2020 to January 2021. Although the District preserved objections regarding any evidence presented between February 2020 and January 2021, the Hearing Officer deferred his ruling but then did not address the objection in the Decision.

84. The Hearing Officer clearly found that the "District has provided the myriad [of] supports and instruction that the student requires for the provision of FAPE."

WHEREFORE, Plaintiff District demands that the Hearing Officer's award of twenty-five (25) hours of compensatory education for the Social Opportunity goal be reversed.

### Count II

**The Hearing Officer erred when he Ordered fifty (50) hours of compensatory education for the progress reported on the Math Application goal from February 2021 to January 2022 because the progress monitoring was reported in a systematic way in short-term goals that was directly responsive to the annual goal.**

85. The Math Application goal was revised in the February 2021 IEP to include two-step addition and subtraction word problems.

86. C.B.'s previous Math Application goal targeted single step addition and subtraction word problems.

87. The February 2021 Math Application goal included short-term goals to build C.B. into full performance of the goal. For example, the first short-term goal

addressed one-step addition and subtraction for two (2) digit numbers, the second short-term goal was for two-step single digit addition and subtraction for single digit numbers, and the third short-term goal was for two-step double digit addition and subtraction word problems. The short-term goals together addressed the goal as a whole and developed a plan as to how C.B. could master the goal.

88. Data was tracked on the Math Application goal in a sequential manner working through each short-term goal.

89. By the end of the annual IEP, C.B. had mastered the Math Application goal by achieving all short-term objectives, which directly corresponded to the overall goal.

90. The Hearing Officer did not fault the District for the Math Application goal. The only criticism offered by the Hearing Officer was that the reporting of progress was made within the short-term objectives. The Hearing Officer believed that the reporting of progress would lead to confusion for Parents.

91. Numerous IEP team meetings were held to review C.B.'s IEPs and goals. The Parent never alleged that the Math Application goal was confusing or misleading.

92. Reporting on progress within the short-term objectives of the overall goal lends itself to an exact, precise, and systematic reporting of data that is clearly within the framework of the IDEA.

93. The Hearing Officer clearly found that the "District has provided the myriad [of] supports and instruction that the student requires for the provision of FAPE."

WHEREFORE, Plaintiff District demands that the Hearing Officer's award of fifty (50) hours of compensatory education for the Math Application goal be reversed.

**Count III**

**The Hearing Officer erred when he Ordered one hundred (100) hours of compensatory education for the Task Accuracy goal in the June 2021 IEP because he misinterpreted the data reported on the goal.**

94. A Task Accuracy goal was added to C.B.'s June 2021 IEP.

95. The Task Accuracy goal measured C.B.'s completion of independent assignments and work tasks over a nine-week period.

96. The goal was set for seventy (70) percent accuracy in completing four (4) out of five (5) assignments or tasks for nine (9) weeks.

97. Progress monitoring data taken quarterly revealed that C.B. did not immediately master the goal since he was only achieving at the seventy (70) percent level of accuracy for four (4) weeks.

98. By the third quarter of the 2021-2022 school year, C.B. achieved seventy (70) percent accuracy for five (5) weeks.

99. By the fourth quarter of the 2021-2022 school year, C.B. mastered his Task Accuracy goal.

100. The Hearing Officer failed to read the Task Accuracy goal accurately because he believed that C.B. achieved the seventy (70) percent goal in the first quarter the goal was implemented. The Hearing Officer fails to attend to the fact that seventy (70) percent was supposed to be achieved for nine (9) weeks to achieve the goal. The first three quarters of implementation of the goal, C.B. did not achieve seventy (70) percent for nine (9) weeks.

101. The Hearing Officer clearly found that the "District has provided the myriad [of] supports and instruction that the student requires for the provision of FAPE."

102. The Hearing Officer committed a clear error.

WHEREFORE, Plaintiff District demands that the Hearing Officer's award of one hundred (100) hours of compensatory education for the Task Accuracy goal be reversed.

## Count IV

**The Hearing Officer erred when he Ordered fifty (50) hours of compensatory services for early dismissals during the 2021-2022 school year, because the District calculated the amount of time missed and provided that amount with additional time preemptively to the Parents.**

103. In May 2022, the Parents brought to the attention of the District an issue where C.B. was being dismissed to the van ten (10) to (15) minutes earlier than the other students at the PTMS.

104. The District investigated the bus issue and offered thirty (30) hours of compensatory education to make up for any time lost.

105. The thirty (30) hours was more than C.B. actually missed of school because there were numerous days he did not ride the bus home because of football and basketball practices.

106. Parents did not accept the offer of compensatory education.

107. The fifty (50) hours ordered by the Hearing Officer exceeds the number of hours actually missed. In fact, even if a student missed fifteen (15) minutes of school each day of the school year (180 days), the total hours missed would be forty-five (45). However, C.B. stayed after school each day he served as the team manager for the PTMS football and basketball teams.

108. Therefore, the Hearing Officer committed a clear error when he ordered fifty (50) hours of compensatory education and did not give credit to the investigation and grant by the District of thirty (30) hours to the Parents.

WHEREFORE, Plaintiff District demands that the Hearing Officer's award of fifty (50) hours of compensatory education for early dismissal be reversed.

Respectfully submitted,

By: *Rebecca Heaton Hall*

Rebecca Heaton Hall, Esquire
Pa. ID. No.: 203137
rheatonhall@wbklegal.com

**WEISS BURKARDT KRAMER**
445 Fort Pitt Blvd., Suite 503
Pittsburgh, Pennsylvania 15219
412.391.9890

Solicitor for the Peters Township School District